2024 IL App (1st) 241145-U

FOURTH DIVISION
Order filed: December 26, 2024

No. 1-24-1145

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| TERRENCE CAMODECA, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 CH 6616 |
| | ) | |
| THOMAS J. DART, in his official Capacity as Sheriff of | ) | Honorable |
| Cook County; and THE COOK COUNTY MERIT | ) | Joel Chupack, |
| BOARD, | ) | Judge, presiding. |
| | ) | |
| Defendant-Appellees. | ) | |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Rochford and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1     *Held*: The Merit Board's finding that the plaintiff engaged in unauthorized off-duty use of technology and in so doing, violated the Cook County Sheriff's Department policies and procedures is not against the manifest weight of the evidence. The Merit Board's findings that the plaintiff disobeyed orders of his superior in violation of Court Service Policy 101.5.5(g) is against the manifest weight of the evidence. As a consequence, we reversed the Merit Board's decision in part and we affirmed in part and reversed in part the circuit court's order affirming the Merit Board's decision. We remanded the matter to the Merit Board with directions to determine the appropriate penalty for the plaintiff's unauthorized off-duty use of technology.

¶ 2     The plaintiff, Terrence Camodeca, appeals the order of the circuit court of Cook County denying his complaint for administrative review and affirming the decision of the Cook County Sheriff's Department Merit Board ("Board") terminating him as a Cook County deputy sherif. The plaintiff contends that the Board's finding that he violated multiple Cook Couty Sheriff's department policies, orders, rules, and regulations is against the manifest weight of the evidence and that there was not sufficient cause for his termination. For the reasons which follow, we reversed the Board's decision in part,  affirmed in part and reversed in part  the circuit court's order affirming the Board's decision, and remanded the matter to the  Board with directions.

¶ 3     The plaintiff was employed as a Cook County deputy sheriff on September 18, 1995. On February 19, 2020, the Sheriff of Cook County (Sheriff) filed two disciplinary complaints against the plaintiff pursuant to 55 ILCS 5/3-7011, and 3-7012 (West 2024). Both complaints sought the termination of the plaintiff as a deputy sheriff due to events that occurred in 2019.

¶ 4     The first complaint, docketed as No. 2222, alleged that in early 2019 the plaintiff made inappropriate comments to two women who worked at a kiosk selling bread on the concourse level of the Chicago Daley Center (Daley Center). The complaint stated that the plaintiff stared at the two women, asked for their ages, and made inappropriate comments such as telling one of the women that he "was going to have a baby with" her. The complaint further alleged that, once the plaintiff's comments were reported by the women to the plaintiff's superiors on March 19, 2019, the plaintiff was ordered by to avoid the kiosk and the two women. According to the complaint, the plaintiff was later observed on video passing by the kiosk multiple times on March 22, 2019, in violation of that order. The complaint asserted that the plaintiff's conduct violated multiple Sheriff's Department orders, policies, and procedures, regarding conduct and insubordination.

¶ 5     A copy of the second complaint which was docketed as No. 2223, is not contained in the record.  However, based on evidence presented at the hearing before the Board and the Board's decision, it appears that complaint No. 2223 related to an incident that occurred on April 5, 2019, and alleged that the plaintiff accessed a computer in the office of the President of the Cook County Board ("President's office") located in the Cook County Building (County Building)  for personal use while he was off duty, after business hours, and after the area had been secured. The second complaint also charged the plaintiff with sending emails relating to his pending Office of Professional Review ("OPR") investigation after he was instructed to not discuss the investigation.

¶ 6     On motion of the plaintiff, the two complaints were consolidated, and they proceeded to a hearing before Board Commissioner Wade Ingram, Sr. on March 20th and March 21st, 2023. Called as witnesses by the Sheriff in support of the complaints were the plaintiff, Sergeant James Rader, Lieutenant Kristin Marunde, Sergeant Jennifer Griffith, Deputy Carlos Pena, and OPR investigator Daniel Cramer. The plaintiff called Patricia Horne as a witness and also testified on his own behalf.

¶ 7     Called as an adverse witness, the plaintiff testified that he had been a deputy sheriff since 1995 and was assigned to Court Services at the Daley Center and the County Building since 2010. He acknowledged that he was aware of and was required to follow all Sheriff's Department policies and procedures.

¶ 8     The plaintiff testified that he was aware of a business called Organic Bread of Heaven that operated at the farmer's market at the Daley Center since 2014 and that in 2018 the business started selling bread at a kiosk in front of room CL-113 on the concourse level of the Daley Center. Room CL-113 contained the lieutenant's office for the Sheriff's Department. He stated that he knew two

women, Mary Bruno and Sarah Franks, who worked at the kiosk. The plaintiff testified that the women occasionally had a baby named Mercy with them at the kiosk. He also knew that Franks was pregnant in early 2019. The plaintiff admitted that, approximately two or three times a week, he had conversations with Bruno and Franks while he purchased bread t the kiosk.

¶ 9 The plaintiff acknowledged that he participated in an OPR interview regarding the complaints against him. In the OPR interview, he told the investigator that, at one point, he told the women at the kiosk that baby Mercy was beautiful, but he denied telling Bruno or Franks that they were beautiful. The plaintiff testified that, with Bruno and Franks present, he said "[t]hat's a beautiful baby". He agreed that the comment "[t]hat's a beautiful baby" was quite different from saying "[y]ou are such a pretty girl, I'm going to have a baby with you, and your baby will be beautiful." According to the plaintiff, he told the OPR investigators that he said to Bruno "Mary, if I had a child, I would let you take care of my child" and that the women must have misinterpreted what he said. The plaintiff denied making any inappropriate comments to Bruno or Franks. He also denied staring at the women or looking at them from behind. He maintained that all his interactions with the women were face-to-face.

¶ 10 The plaintiff testified that he was called into Lieutenant Marunde's office in CL-113 on March 19, 2019. When confronted by Lieutenant Marunde with the allegations of inappropriate comments made by Bruno and Franks, he denied making the statements attributed to him and said that the only conversations he had with the women were to say "good morning" and make "small talk". He stated that he told Lieutenant Marunde that he did not think that the women were lying, but that they must have misinterpreted what he said. He admitted that at the end of the meeting Lieutenant Marunde ordered him to "stay away from the two females". The plaintiff stated that he

told the OPR investigators that he obeyed the order by Lieutenant Marunde by not speaking to the women and not going near them.

¶ 11    The plaintiff admitted that, on March 22, 2019, he was again called into Lieutenant Marunde's office regarding complaints made by Bruno and Franks. During that meeting, he was asked by Lieutenant Marunde "[w]hat part of my stay away order did you not understand?" The plaintiff stated that he responded by telling Lieutenant Marunde "I haven't bothered anyone."

¶ 12    The plaintiff acknowledged  that, on March 22, 2019, he went down the escalator near the Organic Bread of Heaven kiosk multiple times. He explained that the Sheriff's Department lockup was on the concourse level of the Daley Center, and he used the escalator to get to the lockup. He estimated that, over the course of that day, he went down the escalator four or five times to get to the lockup. He also admitted that he walked by the kiosk multiple times on March 22, 2019, but did not recall the exact number of times.

¶ 13    When questioned about the allegations in complaint No. 2223, the plaintiff gave the following testimony. He admitted that he previously been assigned to work at the County Building, specifically in the President's office on the fifth floor. He stated that he was given an access code to enter the President's office while he was assigned to that post. The plaintiff acknowledged that he was authorized to use the access code for county business only. He agreed that the President's office was secured at 5:00 p.m. every evening.

¶ 14    The plaintiff testified that on April 5, 2019, he was assigned to the 8:00 a.m. to 4:00 p.m. shift and "clocked out" at the end of his shift shortly after 4:00 p.m. He stated that, as he walked towards the Merchandise Mart, he realized that the cell phone he had purchased two days prior was missing.   According to the plaintiff, he thought that the phone may have been stolen but

admitted that he did not file a police report of a theft. He testified that he was worried that his phone might have been compromised, and he wanted to contact AT&T to disable the phone remotely.

¶ 15    The plaintiff stated that he walked back to the County Building, and at approximately 4:50 p.m., he went to the President's office to use the computer to look up the AT&T customer service phone number. He saw Deputy Glenda Rudolph when he entered the President's office and told her that he needed to use the computer. He used the computer until around 5:15 p.m. but did not leave the President's office until 5:40 p.m. to allow himself to "de-escalate".

¶ 16    According to the plaintiff, at approximately 5:00 p.m., Deputy Rudolph asked him to leave the President's office, and she then secured the office. The plaintiff admitted that, after the President's office was secured, he used the access code he had been previously given to reenter the office, and he continued using the computer. He also admitted that, while off duty, he entered the President's office and used both the computer and the telephone. The plaintiff acknowledged that he was not authorized to enter the President's office after hours. He also admitted that he entered the President's office to conduct a combination of personal business and county-related business. He acknowledged that, during his OPR interview, he agreed that using county equipment for personal use was not appropriate, but told the OPR investigator that he did not feel that what he did on April 5, 2019, was inappropriate.

¶ 17    The plaintiff identified forms that he signed after his OPR interviews, on July 2, 2019, regarding both the harassment incident and the President's office incident. He agreed that, at the conclusion of each interview, the OPR investigator ordered him "not to disclose any information or material related to the investigation other than to [his] union representative and counsel".

¶ 18     The plaintiff testified that he used a county email address in 2019 which only he had access to. He agreed that Sheriff's Department employees were prohibited from using their county email addresses for personal business. He also acknowledged sending an email to Sheriff's Department Chief of Staff Bradley Curry on July 18, 2019, at 11:03 a.m., stating "I hope when my OPR case is settled I will be able to return to the County Building". The plaintiff testified that the email was likely sent while he was on duty.

¶ 19     The plaintiff also identified an email he sent to Sheriff's Department Executive Director Joseph Bellettiere on August 21, 2019, which stated "I fell [sic] my OPR interview went well. They were very professional and respectful."  He admitted that he also sent multiple emails to the Cook County Board President's secretary Pamela Cummings.  In a June 7, 2019, email sent to Cummings, the plaintiff expressed his hope that he would be able to return to his old post at the County Building. He sent an additional email to Cummings on July 20, 2019, stating "I hope I will be able to go back to the County Building. My life just hasn't been the same."

¶ 20     Sergeant James Rader was the next witness called by the Sheriff.  He testified that he worked in Court Services at the Daley Center. Sergeant Rader stated that, on March 19, 2019, he was approached by Bruno and, over a hearsay objection by the plaintiff's counsel, he recounted the conversation he had with Bruno.   The plaintiff's attorney also made a standing hearsay objection to testimony and documents containing statements by Bruno and Franks, which came up multiple times throughout the hearing.  Counsel for the Sheriff responded to the hearsay objections, stating that the statements were being admitted for their effect on the listener and not for the truth of the matter asserted.

¶ 21    Sergeant Rader testified that Bruno complained about a deputy sheriff that was making her uncomfortable and stated that he "tells me I'm beautiful and that I'm going to have a baby someday and you are going to have a beautiful baby someday." Sergeant Rader stated that Bruno gave him a description of the deputy. He testified that he reported the incident to his supervisor and submitted a harassment complaint form, setting forth Bruno's accusations.

¶ 22    According to Sergeant Rader, he brought Bruno to Lieutenant Marunde's office to speak with her concerning her complaints. He testified that Bruno told them that a deputy sheriff made a comment to her saying "I'm going to have a baby with you. You're such a pretty girl and your baby will be beautiful too." Bruno identified a photo of the plaintiff as the deputy who made the comments.

¶ 23    After the meeting with Bruno, Sergeant Rader brought the plaintiff into Lieutenant Marunde's office. He testified that, when asked about any interactions with Bruno or Franks, the plaintiff stated that he just told them good morning and hello and denied making any inappropriate comments. According to Sergeant Rader, at the conclusion of the meeting, Lieutenant Marunde told the plaintiff "to stay away from the kiosk by 113 and the two young ladies". Sergeant Rader testified that, following the meeting with the plaintiff, Lieutenant Marunde held a meeting with him and the other sergeants and ordered them not to assign the plaintiff to Post 5 or 6, near where the kiosk was located.

¶ 24    Sargeant Rader testified that in the afternoon of March 19, 2019, there was a second meeting in Lieutenant Marunde's office at which Bruno, Franks, and Bruno's family, including her father, mother, sister, and brother, were all present. And again over the hearsay objection of

the plaintiff's counsel, Sargeant Rader testified to the substance of the complaints of harassment by the plaintiff.

¶ 25    Sergeant Rader stated that he was approached by Franks on March 22, 2019, who complained about the plaintiff's suggestive comments and behavior. He testified that on that date he again brought the plaintiff to Lieutenant Marunde's office.  During this meeting, Lieutenant Marunde asked the plaintiff "what didn't you understand," referring to her prior order to stay away from the women. The plaintiff responded that he had not bothered anyone. Sergeant Rader stated that Lieutenant Marunde again ordered the plaintiff "to stay away from the kiosk on the concourse level outside of Room CL-113."

¶ 26    Sergeant Rader testified that, later that same day, Franks came into Lieutenant Marunde's office.  He testified that Franks told him and Lieutenant Marunde that the plaintiff said inappropriate things that made her and Bruno uncomfortable, including asking whether she or Bruno were married and what their ages were. Franks added that the plaintiff made a noise after learning that Bruno was only 19 years old.  She also told them that the plaintiff had stared at her and Bruno multiple times and that he told Bruno that he wanted to have a baby.

¶ 27    According to Sergeant Rader, he and Lieutenant Marunde reviewed video footage of the concourse level pedway outside of CL-113 for the morning of March 22, 2019.  He testified that the video footage showed the plaintiff walking by the kiosk "numerous times." It also showed the plaintiff stepping towards the up escalator and then turning around to face down towards the kiosk where Frank's was working. The video footage itself was not admitted in evidence as an exhibit.

¶ 28    Next, Lieutenant Marunde was called as a witness. She testified that, on March 19, 2019, she was notified by Sergeant Rader about the harassment allegations made by Bruno. She stated

that Sergeant Rader brought Bruno into her office later that day to discuss her complaints. Lieutenant Marunde's testimony regarding the meeting with Bruno and Sergeant Rader in her office on March 19, 2019, was consistent with Sergeant Rader's testimony.

¶ 29 Lieutenant Marunde testified that, following her meeting with Bruno, she summoned the plaintiff into her office along with Sergeant Rader. She stated that, when told of Bruno's complaint, the plaintiff denied Bruno's allegations of inappropriate comments. According to Lieutenant Marunde, at the conclusion of the meeting, she ordered the plaintiff to "stay away from the kiosk area whenever Organic Bread was present." She also ordered the plaintiff "to stay away from the two females." She then called a meeting with all sergeants under her supervision and asked them not to assign the plaintiff anywhere near Post 5 or 6, near where the kiosk was located.

¶ 30 Lieutenant Marunde stated that she was approached by Franks' husband in the morning of March 22, 2019, who told her that the deputy was continuing to come past the kiosk and was staring at Bruno and Franks. She again summoned the plaintiff into her office to meet with herself and Sergeant Rader. During that meeting, she asked the plaintiff "if he did not understand what [she] had told him about staying away from the kiosk and leaving the two girls alone". The plaintiff responded that he "didn't do anything". She stated that, at the end of the meeting, she again ordered the plaintiff to stay away from the kiosk and not to look at Bruno or Franks.

¶ 31 Lieutenant Marunde testified that she reviewed video footage with Sergeant Rader of the area outside CL-113 and the escalator area with Sergeant Rader, and that the footage for March 22, 2019, showed the plaintiff going past the kiosk "numerous times", and at one point, turning and staring down at the kiosk as he went up the escalator.

¶ 32    Lieutenant Marunde stated that, on April 5, 2019, at around 5:45 p.m., Sergeant Jennifer Griffith notified her that the plaintiff had entered the President's office and was demanding to use the computer. Lieutenant Marunde testified that Sergeant Jennifer Griffith told her that the plaintiff was under her command earlier that day, and that she did not authorize him to stay in the President's office after the area was secured, nor was she aware of anyone else authorizing him to do so.

¶ 33    On cross examination, Lieutenant Marunde acknowledged that Sergeant Rader's written summary stated that the specific order was to "stay away from the young ladies." She admitted that the incident description she completed on the form requesting the video footage did not state that the plaintiff made verbal contact with anyone at the kiosk. She stated that, on the video, she did not observe the plaintiff touch or do anything else towards the kiosk or anyone working at it. On redirect, Lieutenant Marunde clarified that her order to the plaintiff on March 19, 2019, was "to stay away from the kiosk and to leave Mary and Sarah alone." She added that the plaintiff was instructed to walk outside and not use the pedway between the County Building and the Daley Center, and that, if he needed to go to CL-113, he was to come down the escalator and straight into the office.

¶ 34    Sergeant Jennifer Griffith was the next witness called by the Sheriff. She testified that on April 5, 2019, at around 5:40 p.m. Deputy Rudolph came into her office in CL-113 at the Daley Center. Over a hearsay objection, Sergeant Griffith testified that Deputy Rudolph asked her to come over to the County Building to speak to the plaintiff. Sergeant Griffith stated that she went to the County Building to investigate the incident, but the plaintiff had left the building by the time she arrived. She reported the incident to Lieutenant Marunde. She stated that the plaintiff was

under her command for part of her shift, from 10:30 a.m. until 4:00 p.m. when the plaintiff's shift ended. Sergeant Griffith testified that she did not authorize the plaintiff to stay in the President's office after the area was secured, nor was she aware of anyone else authorizing the plaintiff to do so.

¶ 35   Deputy Carlos Pena testified that, on April 5, 2019, at around 5:10 p.m., he was working on the first floor of the County Building.  At that time, he was approached by Deputy Rudolph who asked him to go to the President's office.  Over a hearsay objection, Deputy Pena testified that Deputy Rudolph asked him to come upstairs because she wanted him to witness that the plaintiff was in the President's office after hours. Deputy Pena stated that he went upstairs with Deputy Rudolph, saw the plaintiff in the President's office, and asked him to leave the area. Deputy Pena told the plaintiff that he should not be in the President's office on the computer after hours. He testified that he returned to the President's office at 5:30 p.m. to do his routine rounds and saw that the plaintiff was still in the office. Deputy Pena again told the plaintiff that he should not be in the office.

¶ 36   OPR investigator Daniel Cramer was the final witness called by the Sheriff.   Cramer testified that in June of 2019 he was assigned to investigate two complaints against the plaintiff; one related to harassment complaints and the other was for the plaintiff's actions in the President's office on April 5, 2019.  Over a hearsay objection by the plaintiff's counsel, Cramer testified about the details of the allegations made against the plaintiff by Bruno and Franks and Lieutenant Marunde's order that the plaintiff was to stay away from the two women.  As to the complaint for a violation of the personal use of email policy and a security breach, Cramer then testified , again

over a hearsay objection by plaintiff's attorney, that the plaintiff was in the President's office using the computer for personal use after hours and after the office had been secured.

¶ 37    Cramer testified that, during his interview of the plaintiff, the plaintiff admitted that he went into the President's office after the area was secured and used a county computer and phone for non-county business. Several times during his testimony, Cramer was asked whether, "during the OPR interview, did you order the respondent [the plaintiff] not to disclose any information or material related to this investigation to anyone other than to his union representative and counsel?" In each case, Cramer responded "yes."

¶ 38    The first witness on the plaintiff's behalf was Patricia Horne. Horne was the Director of Supply Chain Management for the Sheriff's Department, working at the warehouse located at 2323 South Rockwell Street in Chicago. She testified that she was familiar with the plaintiff and interacted with him daily for approximately four or five years when he was working at the warehouse. Horne stated that the plaintiff had excellent attendance and was meticulous in handling his assignments. She testified that the plaintiff exceeded expectations and that losing him as an employee would hurt her unit.

¶ 39    Testifying on his own behalf, the plaintiff identified numerous mitigation exhibits, including letters from various Sheriff's Department officials including one from Sheriff Dart praising his charity and volunteer work.  Regarding the allegations against him in complaint No. 2223, the plaintiff stated that downloaded onto his cell phone was an application entitled application "FirstNet," which he used for his work with the Sheriff's Department. He stated that he purchased the cell phone intending to use it both for work and personal purposes.  He admitted that while off duty  he went to the President's office on April 5, 2029, to call AT&T about his lost

phone. When he arrived, he spoke to Deputy Rudolph at around 4:50 p.m., asking to use the computer. He stated that Deputy Rudolph told him that he could use the computer and that the office was about to close. The plaintiff testified that he used the computer to obtain the number for AT&T's fraud department and then called the number using an office phone. He stated that he requested AT&T to shut off his phone remotely. He testified that he left the President's office at 5:40 p.m. The plaintiff maintained that he only used the computer to get the number for AT&T's fraud line and that he was on the computer for less than 10 minutes. According to the plaintiff, he did not want to use the phone in Lieutenant Marunde's office in CL-113 because there were other deputies in that area, and they would have overheard that he lost his new phone.

¶ 40 The plaintiff then testified regarding the harassment complaints made by Bruno and Franks. He admitted that during his March 19, 2019, meeting with Lieutenant Marunde she told him "you will not talk to those girls, you will stay away from those girls, don't talk to them." He interpreted the order as directing him not to violate the personal space of Bruno or Franks and to be far enough away from the kiosk so that the women did not feel intimidated. The plaintiff testified that, when he went by the kiosk on March 22, 2019, a "husband and wife team" were at the kiosk, but neither Bruno nor Franks were there. He stated that he acknowledged the two people at the kiosk and told them good morning, but did not get closer than five feet from the kiosk. He admitted that he was facing downward on the escalator at one point that day but explained that this was due to some problems he was experiencing with vertigo at the time.

¶ 41 The plaintiff also testified about the emails he sent after his OPR interview. He explained that he sent the email to Curry because members of the Cook County Board had handed him their business cards and told him to reach out to them if he ever had any problems. The plaintiff

interpreted that to mean that he could email them about issues he was having at work. He denied disclosing any facts about the OPR investigation to Curry, and stated he did not believe he violated Cramer's admonition not to discuss the investigation. He testified that he also did not believe his email to Cummings violated Cramer's admonition not to discuss the OPR investigation.

¶ 42 On cross-examination, the plaintiff testified that he understood Lieutenant Marunde's order to mean that he was not to get closer than 5 feet from the women at the kiosk. He stated that he encountered four different people at the kiosk, the husband-and-wife team on "Tuesday [March 19, 2019]," and Bruno and Franks on "Thursday [March22, 2019]." The plaintiff testified that he did not know whether the wife that was present on Tuesdays was Franks. He stated that, despite his vertigo issues, he used the escalator four to five times on March 22, 2019, to go to the concourse level of the Daley center, because it was a faster way to get to the office in CL-113 than using the elevators.

¶ 43 After hearing closing arguments, the presiding commissioner took the matter under advisement. On July 10, 2023, the Board then issued its final written decision containing findings of fact and conclusions. However, the manner in which the decision was written has made the resolution of the issues in this appeal somewhat difficult.

¶ 44 Under the heading "Findings of Fact" are facts under the subheadings of "Docket No. 2222" and "Docket No. 2223." The facts set forth under the subheading "Docket No. 2222" appear to be merely a recitation of the facts alleged in the Sheriff's complaint which appears in the record. In the absence of the Sheriff's complaint docketed as No.2223, we are unable determine the source of the facts set forth under the subheading "Docket No. 2223." In neither case, however, is there

any indication in that portion of the decision which of the facts set forth were found by the Board to have been proven.

¶ 45    The Board's decision also contains a heading titled "Conclusion" followed by the following sentence:

"Based on the evidence presented, and after assessing the credibility of witnesses and the Weight given by the evidence in the record, the Board finds, by a preponderance of the Evidence, that Respondent Terrence S. Camodeca did violate the Cook County Sheriff's Department Rules and Regulations."

That sentence in the decision is followed by a recitation of the content of what are captioned "Sheriff Order:" 101.5.2 (L) and (M); 101.5.5 (g), (ab) and (as); 136.4; 136.4.5, and 138,3. Although the Board's decision referrers to each of the quoted sections as "Sheriff Order," the Sheriff's complaint refers to the sections as being contained in the Cook County Court Services Department IL Policy Manual. We will refer to the sections consistent with the Board's title of Sheriff Order. It is unclear from the decision whether the Board found that the plaintiff violated each of the referenced Sheriff Order[s] or whether the enumeration was merely a recitation of the sections of the Cook County Court Services Department IL Policy Manuel which the Sheriff alleged in his complaints that the plaintiff had violated. We believe that the latter is the case, because the Board in its decision only made specific findings that the plaintiff violated two of the Sheriff Orders. We will address each of the specific findings in the order in which they appear in the Board's decision. However, before we do, we set fourth our standard of review.

¶ 46    In appeals from circuit court decisions in administrative review actions such as the instant case, we review the decision of the agency, rather than the decision of the circuit court. *Mireles v.*

*Dart*, 2023 IL App (1st) 221090, ¶54. The "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 2024). We will disturb an agency's rulings on questions of fact only if they are against the manifest weight of the evidence. *Mireles*, 2023 IL App (1st) 221090, ¶54. An agency's factual determinations are against the manifest weight of the evidence where an opposite conclusion is clearly apparent. *Id.* ¶56. This court will not reweigh the evidence to make an independent determination of the facts. *Board of Education of City of Chicago v. Illinois Education Labor Relations Board*, 2015 IL 118043, ¶15. However, we will not hesitate to overturn a factual determination made by an administrative agency when the clearly evident, plain, and indisputable weight of the evidence compels an opposite conclusion. *Dye v Illinois Workers' Compensation Comm'n,* 2012 IL App (3d) 110907WC, ¶10.

¶ 47 We address first that portion of the Board's decision which specifically states that "[t]here is sufficient evidence that the Respondent disobeyed Lt. Kristin Marunde's direct order to stay away from the girls (complaining witnesses) and don't go near their kiosk ***," and the Board conclusion that the plaintiff had violated "Court Service Department Policy 101.5.5 (g)."

¶ 48 As it relates to the Board's finding that he disobeyed Lieutenant Marunde's orders, the plaintiff argues that there is no competent evidence to support the finding. We agree.

¶ 49 As noted earlier, on March 19, 2019, Lieutenant Marunde ordered the plaintiff "to stay away from the kiosk by CL-113 and the two young ladies." Following her meeting with the plaintiff on March 22, 2019, Lieutenant Marunde again ordered the plaintiff to "to stay away from the kiosk on the concourse level outside of Room CL-113" and to leave the two women alone.

¶ 50    The only testimony in the record that the plaintiff approached the kiosk or either Bruno or Franks after March 19, 2019, was the testimony of Sergeant Rader and Lieutenant Marunde concerning what they were told by Franks and Franks' husband, which testimony was elicited over the standing hearsay objection by the plaintiff's attorney.

¶ 51    As a general matter, hearsay evidence is not admissible in administrative proceedings. *Abrahamson v. Illinois Dept. of Professional Regulation*, 153 Ill.2d 76, 94 (1992). However, the improper admission of hearsay is not prejudicial error when there is sufficient competent evidence to support the agency's finding. *Id.* At the hearing before the Board, the Sheriff sought to admit, over a standing hearsay objection by the plaintiff's counsel, numerous out of court statements made by Bruno and Franks and Franks' husband regarding the substance of their allegations against the plaintiff, including their interaction with the plaintiff after Lieutenant Marunde's order of March 19, 2019. The Sheriff's attorney continuously represented that the testimony by Sargeant Rader and Lieutenant Marunde concerning what they were told was elicited only for the purpose of showing the effects of the statements on the listener. As the Sheriff did not raise any alternative theory for the admissibility of the statements made to Sargeant Rader and Lieutenant Marunde to establish the truth of the matters asserted either before the Board or this court, we agree with the plaintiff that the hearsay testimony of Sergeant Rader and Lieutenant Marunde concerning what they were told could not be considered as substantive evidence of the truth of the matters asserted.

¶ 52    Sergeant Rader and Lieutenant Marunde did testify that they viewed the video footage of the concourse level outside of CL-113 on March 22, 2019, which they stated showed the plaintiff walking by the kiosk "numerous times," stepping toward the up escalator, and then turning around to face the kiosk where Franks was working. However, neither Sergeant Rader nor Lieutenant

Marunde testified that, subsequent to Lieutenant Marunde's March 19, 2019, order they saw the claimant approached the kiosk or either of the women. In his testimony, the plaintiff admitted only that he went down the escalator near kiosk multiple times on March 22, 2019, to get to the Sheriff's Department lockup which is on the concourse level of the Daley Center or the office located in CL-113. He estimated that, over the course of that day, he went down the escalator four or five times to get to the lockup and walked by the kiosk.

¶ 53 Based on the competent evidence introduced during the hearing before the Board, we find nothing to support the Board's finding that "[t]here is sufficient evidence that the Respondent disobeyed Lt. Kristin Marunde's direct order to stay away from the girls (complaining witnesses) and don't go near their kiosk ***," or its finding that the plaintiff "violated the Rules and Regulations and Policies of the Cook County Sheriff's Office and the Cook County Services Department, and the Cook County Merit Board" or any of the "Sheriff['s] Order[s]" enumerated by the Board in its decision. We conclude, therefore, that the findings and conclusions of the Board that the plaintiff violated Sheriff Order 101.5.5(g) by disobeying Lieutenant Marunde's direct orders to stay away from Bruno and Franks and not to go near the kiosk are against the manifest weight of the evidence.

¶ 54 Although not related to any specific finding of a violation of the Sheriff Department Rules and Regulations, the Board devoted four paragraphs in its decision addressed to the emails sent by the plaintiff to Cummings, Curry, and Bellettiere. Cramer testified that, following his OPR interview of the plaintiff, he ordered the plaintiff "not to disclose any information or material related to the investigation other than to his union representative and counsel." As set out earlier, the emails sent by the plaintiff to Cummings, Curry, and Bellettiere do not contain any information

or material related to the OPR investigation. The text of the emails contained in the record cannot form the basis of any finding that the plaintiff violated Cramer's order or the "Rules and Regulations and Policies of the Cook County Sheriff's Office and the Cook County Services Department, or the Cook County Merit Board"

¶ 55 We turn next to the Board's specific finding that "[t]here is sufficient evidence to prove that the *** [plaintiff] violated Cook County Services Policy 136.4.5 in that *** [he] was off duty and using Sheriff's office equipment and being in a secured area after being told to leave." Based on the testimony of Deputy Pena and the admissions of the plaintiff both when testifying at the hearing and when interviewed by Cramer which admissions we set forth earlier, we find more than sufficient evidence to support the Board's finding that the plaintiff violated Cook County Services Policy 136.4.5.

¶ 56 Specifically finding that the plaintiff violated both Sheriff Order 101.5.5(g) and Sheriff Order 136.4.5, the Board terminated the plaintiff's employment as a Cook County deputy sheriff effective February 19, 2019. As the penalty of termination was obviously predicated on the Board's finding that the plaintiff violated two specific policies of the Cook County Sheriff and considering that the Board's finding that the plaintiff violated Sheriff Order 101.5.5(g) is against the manifest weight of the evidence, we think that the prudent course is to vacate the Board's order of termination and remand the matter to the Board with directions to fix and order an appropriate penalty for the plaintiff's violation of Sheriff Order 136.4.5.

¶ 57 Based upon the foregoing analysis, we: reverse the Board's finding and conclusion that the plaintiff violated Sheriff Order and "Court Service Department Policy 101.5.5 (g) by disobeying Lieutenant Marunde's direct orders; reverse that portion of the circuit court's order

which affirmed the Board's finding and conclusion that the plaintiff violated Sheriff Order and "Court Service Department Policy 101.5.5 (g) by disobeying Lieutenant Marunde's direct orders; affirm that portion of the circuit court's order which affirmed the Board's findings and conclusion that the claimant violated Sheriff Order and "Court Service Department Policy 136.4.5 by using Sheriff's office equipment while off duty and being in a secured area after being told to leave; vacate the plaintiff's termination as a Cook County deputy sheriff effective February 19, 2019; and remand the matter to the Board with directions to fix and order an appropriate penalty for the plaintiff's violation of Sheriff Order 136.4.5.

¶ 58    Circuit Court affirmed in part and reversed in part.

¶ 59    Cook County Sheriff's Department Merit Board decision reversed in part, vacated in part, and remanded with directions.